UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MISSOURI

UNITED STATES OF AMERICA,      )
                               )
                Plaintiff,     )
                               )
        vs.                    )  Case No.
                               )  12-00291-19-CR-W-GAF
VICTOR VICKERS,                )
                               )
                Defendant.     )


            TRANSCRIPT OF SENTENCING HEARING
          BEFORE THE HONORABLE GARY A. FENNER
             UNITED STATES DISTRICT JUDGE
                    MAY 28, 2015
                KANSAS CITY, MISSOURI


FOR THE PLAINTIFF:
     MR. STEFAN C. HUGHES
     Assistant United States Attorney
     Charles Evans Whittaker Courthouse
     400 East Ninth Street, Floor 5
     Kansas City, Missouri 64106

FOR THE DEFENDANT:
     MR. WILLIAM DAVID LANGSTON
     Langston Law Chartered
     115 East Park Street, Suite C
     Olathe, Kansas 66061



     Proceedings recorded by mechanical stenography, transcript
produced by computer



                KATHERINE A. CALVERT, RMR, CRR
                 FEDERAL OFFICIAL COURT REPORTER
                CHARLES EVANS WHITTAKER COURTHOUSE
                    400 EAST NINTH STREET
                 KANSAS CITY, MISSOURI 64106

1

I N D E X                                    Page

GOVERNMENT'S EVIDENCE

DANNY PHILLIPS
     Direct examination by Mr. Hughes. . . . . . . . . .  22
     Cross-examination by Mr. Langston . . . . . . . . .  28

DEFENDANT'S EVIDENCE

JOHN R. HUMPHREY
     Direct examination by Mr. Langston. . . . . . . . .  36
     Cross-examination by Mr. Hughes . . . . . . . . . .  39

LAVERN VICKERS
     Direct examination by Mr. Langston. . . . . . . . .  42
     Cross-examination by Mr. Hughes . . . . . . . . . .  49


INDEX OF EXHIBITS

EXHIBIT
  NO.           DESCRIPTION          OFFERED     RECEIVED

FOR THE GOVERNMENT:

   1         Videotaped statement       25          25

   2         Transcript                 25          25

MAY 28, 2015

          THE COURT:  Are you ready, Mr. Hughes?

          MR. HUGHES:  I am, Your Honor.

          THE COURT:  And, Mr. Langston, are you ready?

          MR. LANGSTON:  We are, Your Honor.

          THE COURT:  Mr. Langston, I'm confident you've
reviewed the presentence report with Mr. Vickers; is that
correct?

          MR. LANGSTON:  We have.

          THE COURT:  And you've made a number of objections,
and I'm advised that you and Mr. Hughes each have some evidence
that you'd like to present in this matter.  I don't know if the
two of you have had any discussion or have any suggestion since
the objections are so extensive as to what might be the best
approach to addressing these issues.  I don't know if the
evidence either of you have to present go to particular
objections or not.

          So do you -- apparently Mr. Langston would like for
you to go first on that.

          MR. HUGHES:  Well, good afternoon, Your Honor.  Mr.
Langston and I have been working together trying to help
economize the Court's time.  I will tell the Court that we will
be conceding the issue regarding the amount of time that we can
ask for for Mr. Vickers.  The PSI calculated it at 20 years;
however, my appellate office, through Lajuana Counts and Phil

| | |
|---|---|
| 1 | Koppe, advised me that the Eighth Circuit would not support any |
| 2 | imposition of a sentence beyond five years; therefore, to that |
| 3 | extent I join Mr. Langston's objection regarding anything |
| 4 | beyond a class D felony amount of time. |
| 5 | THE COURT:  And does that resolve the issues |
| 6 | relating to drug quantity, Mr. Langston? |
| 7 | MR. LANGSTON:  It doesn't resolve the issues |
| 8 | relating to the drug quantity, Judge.  There will be some |
| 9 | evidence that -- and some argument I will make about drug |
| 10 | quantity so those -- the attribution to Mr. Vickers of a |
| 11 | cocaine transaction that happened with Karen Briggs which was |
| 12 | included in his calculations as relevant conduct we disagree |
| 13 | with still. |
| 14 | In addition to that, there also is marijuana weight |
| 15 | that was attributed to Keith Jones' proffer.  We object to |
| 16 | that.  I will be presenting argument from testimony from the |
| 17 | trial about those two things. |
| 18 | And then, I guess, the other housekeeping thing, |
| 19 | Judge, I know that the prosecutor, the government's got cued up |
| 20 | a one-hour video of the recorded statement of Kristen Forbush |
| 21 | who is the victim in the State case that Mr. Vickers is still |
| 22 | accountable, under charge for a homicide; and my suggestion, |
| 23 | Judge, is that before we play the videotape, I have an |
| 24 | argument, a legal argument, that I would like to make about the |
| 25 | admissibility of that video and the evidence that it's going to |

4

```
 1    show, and it's a guidelines argument about the permissibility
 2    of using the State court homicide charge as relevant conduct.
 3    If you rule that you're going to consider that, then certainly
 4    we can listen to the video and I'll address the issues of the
 5    weight of that evidence at that time, but it might save us time
 6    if I presented that first and let you make a decision about
 7    that.
 8                THE COURT:  All right.  That's agreeable as long as
 9    you're brief in your objection to it.
10                MR. LANGSTON:  I'll be as brief as I can.  It's a
11    little bit complicated.  I'll try to outline it as quickly as I
12    can.
13                THE COURT:  All right.
14                MR. LANGSTON:  Would you like me to do that?
15                THE COURT:  Fine.
16                MR. LANGSTON:  Would you like me to do it from the
17    podium or from here?
18                THE COURT:  From the podium if you wouldn't mind.
19                MR. LANGSTON:  Good afternoon, Your Honor.  May it
20    please the Court.
21                THE COURT:  Sir.
22                MR. LANGSTON:  Counsel.
23                Judge, we object in the presentence report to the
24    application of the 2A1.1 murder or death as a result of the
25    drug conspiracy as being used as relevant conduct in this case.
```

We make that objection based on United States Sentencing

Guidelines operation, and specifically the United States

Sentencing Guidelines authorized the use of relevant conduct in

Section 1B1.3(a), and that states that the application of the

cross-reference can be only utilized with respect to offenses

which would require grouping under United States Sentencing

Guidelines, Section 3D1.2(d).

          THE COURT:  I think you addressed this in your

sentencing memorandum.

          MR. LANGSTON:  I did.

          THE COURT:  Okay.

          MR. LANGSTON:  I did.

          THE COURT:  And I read your sentencing memorandum.

I thought that this was an issue or concern that the parties

had not yet had an opportunity to address, and although you

make a good argument in your sentencing memorandum, I'm going

to deny your objection at this time.  I will take the evidence

and evaluate that and reserve final ruling on that after I have

had an opportunity to view that.  So I appreciate it and I

apologize to you for misunderstanding.

          MR. LANGSTON:  I'm sorry.

          THE COURT:  You did brief it extensively.

          MR. LANGSTON:  I did, Judge.

          THE COURT:  And I appreciate that.  Thank you.

          Before we get to any of the evidence, I have to

1    address all of the objections that have been made; and if --

 2    when I get to any of these points, if they relate to something

 3    that either of you intend to present evidence on, let me know

 4    and I will reserve judgment on a specific objection until we've

 5    had an opportunity to do that.

 6            And many of the objections may be interrelated, but

 7    just go by paragraph, starting -- the first objection is to

 8    paragraph 8, and defense takes the position that paragraph 8 is

 9    factually inaccurate.  Mr. Vickers was never identified in any

10    wiretap telephone calls with Andre Taylor, Darryl Taylor, or

11    any other member of the conspiracy which he was convicted.

12            And, Mr. Hughes, do you dispute that?

13            MR. HUGHES:  No, Your Honor.

14            THE COURT:  All right.  That objection is sustained.

15            And I'm not sure paragraph 8 said that, but to the

16    extent that it might have or might otherwise insinuate, the

17    objection is sustained.

18            You next object to paragraph 38 objecting that it

19    contains unsupported hearsay statements about codefendant Allen

20    supplying Vickers with drugs and that there is no evidence to

21    support this claim.

22            And what is the government's position on that, Mr.

23    Hughes?

24            MR. HUGHES:  I completely disagree.  Keith Jones

25    testified that Mr. Vickers admitted purchasing large amounts of

marijuana from Rahmon Allen; and so, therefore, it's an

admission against his interest and, therefore, not hearsay.

THE COURT:  There was testimony to that effect.  And

I don't know, Mr. Langston, and it's certainly not necessary

for me to put words in your mouth, but I take it this somehow

relates to the conviction that was returned by the jury?  Is

that an issue with you, or do you just dispute there was any

testimony that --

MR. LANGSTON:  I think our position, Judge, is that

it's twofold.  As stated in the objection that it was

unsupported hearsay, Mr. Hughes believes that it was an

admission against interest, therefore, admissible.  I would

supplement that argument today with anything that happened with

Rahmon Allen is not during the time Mr. Vickers was part of the

instant conspiracy of conviction; and, therefore, according to

the United States Sentencing Guidelines and case law, cannot be

used as relevant conduct in this sentencing for this drug

conspiracy, and that was an argument that was not made in the

objections.

To answer your question directly, now that the

government has conceded that the five years is the maximum, our

argument is that and will be that there was really only

testimony from Darryl Taylor about 5 -- excuse me -- about 10

to 14 pounds, 5 to 7 kilograms of marijuana that was testified

to about, incidents that happened during the period of time

```
 1   circumscribed by this indictment and also the period of time

 2   that Mr. Vickers was involved, so I'm not sure that answers

 3   your question but that's our position.

 4           THE COURT:  All right.  Your objection to paragraph

 5   38's denied.

 6           Paragraph 39.  You take the position that there are

 7   inaccuracies within paragraph 39.  First Mr. Vickers never

 8   purchased marijuana from Andre Taylor; that Mr. Vickers never

 9   owed Darryl Taylor any money; and that Mr. Vickers did not

10   purchase crack cocaine from Hudspeth.

11           And, Mr. Hughes, what's your position on these

12   matters?

13           MR. HUGHES:  I agree that Mr. Vickers never

14   purchased marijuana from Andre Taylor.  He purchased marijuana

15   from Darryl Taylor who was, in fact, supplied by Andre Taylor.

16   Regarding Mr. Vickers purchasing crack cocaine from Mr.

17   Hudspeth, we have no evidence to support that.

18           THE COURT:  All right.  Your objection to any

19   reference or indication that Mr. Vickers purchased from Andre

20   Taylor is sustained, your objection to reference or implication

21   that Mr. Vickers purchased crack cocaine from Mr. Hudspeth is

22   granted, and your objections to paragraph 39 are sustained.

23           MR. LANGSTON:  Judge, if I might ask for

24   clarification.  The other allegation was there was $10,000 owed

25   between my client and Darryl Taylor.  My recollection of the
```

1  trial testimony is Darryl Taylor testified there was never a

2  $10,000 debt and that my client did not owe him $10,000 at any

3  time.

4          THE COURT:  I believe that was the testimony at

5  trial.

6          MR. HUGHES:  And I agree.

7          THE COURT:  All right.  Sustained.

8          Paragraph 40.  You take the position that there was

9  no firearm recovered by Mr. Vickers, and there is insufficient

10 evidence to show that Mr. Vickers was in possession of a

11 firearm, and you object to those references.

12         Mr. Hughes, you want to speak to that?

13         MR. HUGHES:  Yes, Your Honor.  The PSI is absolutely

14 correct in this assertion.  The confidential informant reported

15 to the handling agent that while doing this transaction, he

16 observed the defendant, Victor Vickers, I believe in the front

17 driver's seat with a gun between his legs.

18         THE COURT:  I'm going to sustain the objection to

19 paragraph 40, not able to find sufficient indicia of

20 reliability from the information provided.

21         MR. LANGSTON:  Judge, may I ask for clarification?

22         THE COURT:  Yes.

23         MR. LANGSTON:  Judge, I believe paragraph 40 also

24 imputes to Mr. Vickers the quantity of cocaine that was dealt

25 in that transaction in addition to the gun issue.  We object to

1    that on a number of reasons.

2            First of all, there was no agreement between Garron

3    Briggs and Victor Vickers to sell any cocaine to anyone or the

4    confidential informant.  We submit that Mr. Vickers was merely

5    present; that he was not part of any conspiracy to do that.  As

6    a matter of fact, there was never any testimony at this trial

7    that Mr. Vickers ever dealt in cocaine at all.  As a matter of

8    fact, the testimony from every witness, as I recall, that

9    testified about Mr. Vickers testified that he never was

10   involved in cocaine; that he did not sell cocaine; did not

11   distribute it; did not hold it.  And so I'm concerned that

12   absent bringing that argument up that we might move past that

13   without fully addressing it.

14           Our position is that there was no common source, no

15   common accomplices, no common customers, and that Mr. Vickers

16   was not part of any cocaine deal and did not conspire to be

17   part of one.

18           THE COURT:  Okay.  Well, Mr. Vickers is not

19   attributed with any crack cocaine amount as a result of this

20   incident on July the 27th of 2011 in determining the drug

21   quantity, was he?

22           MR. LANGSTON:  I believe that he was, Judge.

23           THE COURT:  Was he?

24           MR. LANGSTON:  I believe that was converted --

25           THE COURT:  Ms. Gruenbacher?

1          THE PROBATION OFFICER:  Yes, Your Honor, he was.

2          THE COURT:  That amount of crack cocaine was

3    attributed to Mr. Vickers?

4          THE PROBATION OFFICER:  That was also included in

5    the calculation, yes, Your Honor.

6          THE COURT:  Do you have anything else on that, Mr.

7    Hughes?

8          MR. HUGHES:  No, Your Honor.

9          THE COURT:  All right.  Objection's sustained.

10          And, Ms. Gruenbacher, I know it's a moving target,

11    but hopefully you will keep track of my rulings and help me

12    determine the impact of all of that.

13          THE PROBATION OFFICER:  I'll do my best, Your Honor.

14          THE COURT:  Thanks.

15          Paragraph 41.  You take the position that this

16    should not -- this information should not be placed in the

17    offense conduct section.  I don't know this really has any --

18    doesn't have any impact on the guideline calculation, and in my

19    mind, have any impact on statutory sentencing considerations.

20          It is noted in the paragraph that Mr. Vickers was

21    accused of this offense.  Well, I take that back.  Except to

22    the extent that any involvement by Mr. Vickers in the murder of

23    Edward Ewing that is found to be supported by evidence, and I

24    understand that this is what you have some evidence that you'd

25    like to offer on, Mr. Hughes?

1          MR. HUGHES:  It is, Your Honor.

2          THE COURT:  All right.  I'll reserve ruling on the

3   objection to paragraph 41.

4          Paragraph 45.  You take the position that the

5   alleged quantities are exaggerated, and the objection goes on

6   for about three pages, all of which relate to the drug quantity

7   calculation.  Would that be -- would that be correct, Mr.

8   Langston?

9          MR. LANGSTON:  That is correct.  It all deals with

10  what the ultimate sentence will be based on the drug quantity

11  calculation.

12         THE COURT:  And how would you believe this should be

13  approached, Mr. Hughes?

14         MR. HUGHES:  Well, Judge, there were two statements

15  attributable to the one cooperator who testified about selling

16  Andre Taylor -- excuse me -- selling Victor Vickers marijuana

17  that Andre Taylor provided and that was through the testimony

18  of Darryl Taylor.

19         Darryl Taylor cooperated -- began cooperating back

20  in July of 2013, and when he initially proffered and he told

21  the agents that he was selling Mr. Vickers marijuana on a

22  weekly to biweekly basis in 5- to 8-pound increments for an

23  aggregate amount of several hundred pounds or over a hundred

24  pounds, I believe, and at trial -- well, back up.

25         Just before trial Mr. Vickers had people submit to

Darryl Taylor the so-called affidavit, and Mr. Taylor testified during the trial that he was intimidated by that whole ordeal; and when he testified at trial, he testified that he only sold Victor Vickers marijuana on two occasions and it was only 10 to 14 pounds. At that point is when I impeached him with his prior inconsistent statement given to the agents in July of 2015. But with respect to Darryl Taylor's testimony, he was the best witness we had about marijuana coming directly from Andre Taylor.

THE COURT: Okay. And, I mean, I don't mean to state or belabor the obvious but there haven't been any further charges brought against Mr. Taylor as a result of that?

MR. HUGHES: No.

THE COURT: And I guess my point on that is that I believe that I'm somewhat -- I don't know bound is the right word, but I believe that the testimony of Darryl Taylor at trial being inconsistent with the previous statement, that his trial testimony when he was under oath and in court and before the jury is without some compelling reason to ignore that and, I mean, I don't suppose Mr. Darryl Taylor's here to testify today and lend any clarification to any of that. Would that be true he's not here?

MR. HUGHES: That is true. Yes.

THE COURT: And won't testify any further about it.

I'm going to limit the drug quantity attributable

1    through Mr. Darryl Taylor's statements and information to that

2    which he testified to at trial.

3            And what are the other issues contained within

4    paragraph 45, Mr. Langston?

5            MR. LANGSTON:  Judge, the other issue is Keith Jones

6    and the attributing of 100 pounds of marijuana from Keith Jones

7    to my client, Mr. Vickers.  Keith Jones' testimony was that he

8    stopped selling marijuana in 2009 and began selling cocaine

9    exclusively.  And so my argument would be that any transactions

10   that occurred prior to the commencement of the time period of

11   this indictment, which was in February of 2010, by operation of

12   the United States Sentencing Guidelines cannot be used as

13   relevant conduct.  Mr. Vickers was not named as part of this

14   conspiracy until April of 2011.  So I think that any amount

15   that Keith Jones could attribute to Mr. Vickers is improperly

16   done.

17           THE COURT:  All right.  And, Mr. Hughes, would you

18   like to speak to that?

19           MR. HUGHES:  Keith Jones did acknowledge selling the

20   amounts of marijuana to Mr. Vickers.  I leave it to the Court's

21   discretion to determine whether or not that should be

22   attributable to him.

23           THE COURT:  All right.  Was there any other

24   information that Mr. Jones continued to sell marijuana during

25   the time that Mr. Vickers was involved in the conspiracy?  Like

```
 1    any reports on Mr. Jones' criminal activity during that time
 2    frame or evidence against him in that regard?
 3              MR. HUGHES:  Judge, the agent has informed me that
 4    Keith Jones and Mr. Vickers were middleman deals between
 5    themselves.  So, yes, to answer your question.
 6              THE COURT:  And you say you have some testimony to
 7    support that?
 8              MR. HUGHES:  I can put it on through Special Agent
 9    Corbin.  Give us a moment, Judge.
10              THE COURT:  Sure.
11              MR. HUGHES:  Actually, Judge, we don't have any
12    evidence.
13              THE COURT:  All right.  Objection to Keith Jones
14    providing marijuana to Mr. Vickers during the time frame of Mr.
15    Vickers' involvement in the conspiracy is sustained.
16              And what else is there in this objection to
17    paragraph 45 that needs to be addressed, Mr. Langston?
18              MR. LANGSTON:  Could I have just a moment?  Judge,
19    those are the only issues that we have exception with in
20    paragraph 45.
21              THE COURT:  All right.  Paragraph 51.  You say the
22    base offense level is incorrect.  The 2A1.1 enhancement is
23    inappropriate, and this relates to the relevant conduct
24    regarding the murder charge.  Is that what this is?
25              MR. LANGSTON:  That is correct, Judge.  That links
```

1　to the objection you took under advisement earlier which is

2　that 2A1.1 enhancement is inappropriate and misapplied in the

3　sentencing guidelines.

4　　　　　THE COURT:  All right.  And are there any other

5　issues raised in this very lengthy objection, and I realize a

6　lot of it is your legal argument and position on all of that,

7　but I didn't see any other issues.  I don't want to overlook

8　any if there are any.

9　　　　　MR. LANGSTON:  I don't believe there are, Judge.  I

10　think we were objecting to the base offense level of 43 based

11　on that inapplication.

12　　　　　THE COURT:  Paragraphs 56 and 59, those are going to

13　depend upon how I rule on the issue in paragraphs 41 and 51.

14　　　　　Do you agree with that, Mr. Langston?

15　　　　　MR. LANGSTON:  I do, Judge.

16　　　　　THE COURT:  And paragraph 88 you object that and

17　state that Mr. Vickers has documents and can verify his work

18　history and that you can provide that information.  Where's all

19　that stated, Mr. Langston?

20　　　　　MR. LANGSTON:  Judge, I believe that we have

21　provided to Ms. Gruenbacher tax returns and some other

22　statements.  My client sent those directly to her after my

23　sending them to him in the interest of time.  I have those

24　here.  It may take me a moment to find them but I do have them.

25　　　　　Am I incorrect, Ms. Gruenbacher?

1          THE COURT:  Do you know if you have them, Sylvia?

2          THE PROBATION OFFICER:  There was some additional

3    information I can provide to the Court.

4          THE COURT:  Okay.  All right.  And, Mr. Langston,

5    you want to walk me through this and briefly tell me what it is

6    that you provided?

7          MR. LANGSTON:  Judge --

8          THE COURT:  I have Exhibit A and Exhibit B.

9          MR. LANGSTON:  I'm not sure which one yours is.  I

10   have a Form 1040.

11         THE COURT:  Yeah, that's Exhibit B.

12         MR. LANGSTON:  That's the 2010 taxes and the

13   supporting schedules that would support those taxes.

14         THE COURT:  Yeah, that's Exhibit A.  Well, Exhibit A

15   relates to 2010 1040 and Exhibit B is 2009 1040.

16         MR. LANGSTON:  Judge, that would be correct, and

17   that is what we have here today that we would present.  So we

18   can present to you --

19         THE COURT:  Let me glance at those then.  I take it

20   the other papers are just supporting documentation?

21         MR. LANGSTON:  I believe they are the schedules

22   required to be filed with the Internal Revenue Service to

23   support the return, yes.

24         THE COURT:  Have you seen any of this, Mr. Hughes,

25   or do you care to?

1        MR. HUGHES:  No, Judge, because I don't think it's

2   going to ultimately matter.

3        THE COURT:  I agree.  But the documentation has been

4   provided and reviewed, and the record should reflect that the

5   1040 for 2009 reflects an adjusted gross income of $13,500 and

6   the 1040 for 2010 reflects an adjusted gross income of $25,500.

7        Anything further on that, Mr. Langston?

8        MR. LANGSTON:  Nothing, Your Honor.  Thank you.

9        THE COURT:  Thank you.

10       Paragraph 95.  This is an issue the government has

11  conceded with the statutory maximum of five years.

12       Correct, Mr. Hughes?

13       MR. HUGHES:  That is correct, Your Honor.

14       MR. LANGSTON:  We're satisfied with that, Judge.

15       THE COURT:  Thank you.

16       Paragraph 96.  And this relates to the guideline

17  calculation, the issue of relevant conduct as outstanding, but

18  I've ruled the other issues, and so we'll come back to the

19  guideline calculation after I've ruled on the relevant conduct

20  question.

21       Paragraph 98.  You take the position that only two

22  years of supervised release is allowed and probation office

23  says it's three.

24       MR. LANGSTON:  Judge, it was based -- the three was

25  based on the 841(c).  We are now dealing with 841(d) because of

1   the concession by the government.  I believe the two-year

2   supervised release would be appropriate for that level of

3   punishment.

4           THE COURT:  Are you at the point where you

5   calculated that yet, or do you want to come back to it, Ms.

6   Gruenbacher?

7           THE PROBATION OFFICER:  For the term of supervised

8   release, Your Honor?

9           THE COURT:  Right.  We'll come back to it.

10          THE PROBATION OFFICER:  Actually, Your Honor, for

11  class C and class D felonies are the same of three years.

12          THE COURT:  It's no more than two years?

13          THE PROBATION OFFICER:  For supervised release?

14          THE COURT:  Right.  I didn't hear what you said.

15  Two or three?

16          THE PROBATION OFFICER:  It's one to three years.

17          THE COURT:  One to three years.  All right.  Your

18  objection to paragraph 98's denied.

19          And paragraph 100.  Again, I think we've already

20  addressed that in terms of the statutory maximum.

21          MR. LANGSTON:  We have, Judge.

22          THE COURT:  And paragraph 102.  That relates to a

23  condition of supervision, and when we get to that point, I

24  would like for you to bring that up to me again, Mr. Langston.

25          And paragraph 103.  You say the maximum fine should

1  be $250,000.

2          MR. HUGHES:  I understand that may be a distinction

3  without a difference, but I believe that's what the D felony

4  the maximum fine is.  I was wrong about the supervised release

5  so I could be proven wrong about that.

6          THE COURT:  I don't see any resources that support a

7  fine.

8          Ms. Gruenbacher.

9          THE PROBATION OFFICER:  Your Honor, I don't have a

10  statute book with me.  The government might have that

11  information.  Under the guidelines --

12          THE COURT:  All right.  We'll come back to that too.

13          All right.  Have we addressed everything that can be

14  addressed before determining the relevant conduct issue to your

15  knowledge, Mr. Hughes?

16          MR. HUGHES:  Yes, we have, Your Honor.

17          THE COURT:  Mr. Langston, would you agree other than

18  the matters I've reserved?

19          MR. LANGSTON:  I would.

20          THE COURT:  And, Mr. Hughes, would you like to

21  present something relating to the relevant conduct issue at

22  this time?

23          MR. HUGHES:  Yes.  Yes, Your Honor.

24          THE COURT:  All right.

25          MR. HUGHES:  At this time the government calls

1   Detective Danny Phillips to the stand.

2                       GOVERNMENT'S EVIDENCE

3   DANNY PHILLIPS, being sworn by the courtroom deputy, testified:

4               MR. HUGHES:  May it please the Court.

5               THE COURT:  Mr. Hughes.

6   DIRECT EXAMINATION BY MR. HUGHES:

7   Q       In a loud and clear voice would you state your name for

8   the record, sir.

9   A       Danny Phillips.

10  Q       Where are you employed?

11  A       Kansas City, Missouri Police Department.

12  Q       How long have you been so employed?

13  A       Over 24 and a half years.

14  Q       And what is your current assignment with the Kansas

15  City, Missouri Police Department?

16  A       Currently traffic investigations.

17  Q       And what was your assignment on or about August 18th,

18  2011?

19  A       Homicide unit.

20  Q       And as a homicide detective, did you have the occasion

21  to participate in the investigation of the murder of Edward

22  Ewing which occurred on August 16th, 2011, at 7001 East 85th

23  Terrace, Kansas City, Jackson County, Western District of

24  Missouri?

25  A       Yes, sir.

1    Q      What was the cause of the decedent's death?

2    A      Multiple gunshot wounds.

3    Q      Were any suspects developed in connection with this

4    murder?

5    A      Yes.

6    Q      Are any of the suspects that were developed in

7    connection with this murder present in this courtroom today?

8    A      Yes.  Mr. Vickers.

9    Q      And would you identify him by race, sex, and an item of

10   clothing, please?

11   A      Light-skin black male seated at the defense table

12   wearing the orange jumpsuit.

13          MR. HUGHES:  Your Honor, I ask the record reflect

14   the witness has identified the defendant.

15          THE COURT:  Record will so reflect.

16   Q      (By Mr. Hughes)  Can you tell the Court the primary

17   source of information that identified Mr. Vickers as one or

18   more persons involved in this murder?

19   A      That would be the victim, Kristen Forbush.

20   Q      And how did she communicate that information to you?

21   A      In person.

22   Q      And you interviewed her?

23   A      I did.

24   Q      And where did that interview take place?

25   A      Police headquarters.

| | |
|---|---|
| 1 | Q    Did that interview take place on August 18th, 2011? |
| 2 | A    Yes. |
| 3 | Q    And who else was present during this interview other |
| 4 | than you and Ms. Forbush? |
| 5 | A    I don't recall anybody else being present. |
| 6 | Q    Was the interview in any way memorialized or |
| 7 | documented? |
| 8 | A    Video recorded. |
| 9 | Q    And was the video transcribed? |
| 10 | A    Yes. |
| 11 | Q    So, in other words, you and/or a stenographer recorded |
| 12 | every question and response that Ms. Forbush gave to your |
| 13 | questions? |
| 14 | A    Yes, sir. |
| 15 | Q    And prior to coming to court today, have you had the |
| 16 | occasion of reviewing the DVD that contains the contents, the |
| 17 | video and visual and audio of your interview with Ms. Forbush |
| 18 | that occurred August 18, 2011? |
| 19 | A    I have. |
| 20 | Q    And have you had the occasion of reviewing the |
| 21 | transcript that was prepared in connection with that interview? |
| 22 | A    I have. |
| 23 | MR. HUGHES:  Your Honor, may I approach the witness? |
| 24 | THE COURT:  You may. |
| 25 | Q    (By Mr. Hughes)  I show you what's been previously |

```
 1   marked for identification as Government's Exhibit No. 1 and ask
 2   if you recognize this exhibit?
 3   A     I do.  It's the DVD copy of her statement titled by me
 4   in my handwriting.
 5   Q     And I show you what's been previously marked for
 6   identification as Government's Exhibit No. 2 and ask if you
 7   recognize that?
 8   A     Yes.  This is the transcript of the videotaped
 9   statement of that DVD.
10   Q     With respect to Government's Exhibit No. 2, does it
11   fairly and accurately record the questions that you asked and
12   the answers that she gave to those questions?
13   A     Yes, from beginning to finish.
14              MR. HUGHES:  Your Honor, if there are no objections,
15   I move for admission of Government's Exhibits Nos. 1 and 2 into
16   evidence for the limited purpose for this sentencing hearing.
17              MR. LANGSTON:  No objection.
18              THE COURT:  Thank you.
19              Received.
20              MR. HUGHES:  Judge, request permission to publish
21   the video.
22              THE COURT:  Granted.
23              (Government's Exhibit No. 1 was played to the
24   Court.)
25              MR. LANGSTON:  Judge, I hate to interrupt but -- can
```

1    we stop for just a second?

2              THE COURT:  Sure.

3              MR. LANGSTON:  I was trying to find my pages that

4    correspond with what's being said.  My pages jump from 94 to

5    103.  So I'm missing nine pages of the transcript, and I'm not

6    sure what was said during this period of time because the audio

7    was not very good.

8              THE COURT:  Do you want us to run extra copies of

9    those missing pages, or do you have another one you can share

10   with Mr. Langston just for these pages?

11             (Discussion off the record.)

12             THE COURT:  Ready?  Ready, Mr. Langston?

13             MR. LANGSTON:  Yes, Judge.  Thank you.

14             (Government's Exhibit No. 1 continued to be played

15   to the Court.)

16   Q     (By Mr. Hughes)  Detective Phillips, can you tell the

17   Court what, if any, relationship Garron Briggs has to the

18   defendant, Victor Vickers?

19   A     First-blood cousins.

20   Q     So they are related by blood and are first cousins?

21   A     Yes.

22   Q     And can you describe with a little more detail what

23   motive evidence you developed to explain why Mr. Briggs, Mr.

24   Vickers, and the unidentified third person were motivated to go

25   and kill Mr. Ewing and shoot Ms. Forbush?

```
 1    A       Information was received a very large amount of money,

 2    I believe $45,000, was taken from Briggs' girlfriend's

 3    apartment in Lee's Summit, and a theory, a motive was that

 4    Edward was used as a scapegoat for that theft because he was --

 5    he helped Briggs' girlfriend move some things into her

 6    apartment, her Lee's Summit apartment, I believe it was

 7    July 31st, and soon after that, Briggs' girlfriend reported a

 8    remote to their garage door being stolen or lost.

 9    Q       So that was the significance of you asking Ms. Forbush

10    about her conversation with Kyesia Ransom --

11    A       Yes.

12    Q       -- about Kyesia Ransom telling Ms. Forbush about a

13    missing garage door remote?

14    A       Yes.

15    Q       And are you familiar with the sum and substance of the

16    Kansas City Police Department's investigation of this homicide?

17    A       Yes.

18    Q       And was there any evidence, any shred of evidence that

19    Edward Ewing sold drugs?

20    A       No.

21    Q       Was there a shred of evidence that Edward Ewing took a

22    penny from Garron Briggs and/or Victor Vickers?

23    A       No.

24    Q       And there was a little Q and A in there about Ms.

25    Forbush telling you that Kyesia Ransom had admitted that Kyesia
```

1   Ransom had agreed to have her car searched?

2   A      Yes.

3   Q      And who searched Kyesia Ransom's car?

4   A      I did.

5   Q      And what, if anything, of evidentiary value did you

6   find inside that car?

7   A      Well, in the trunk of the vehicle there I located -- I

8   don't know what you would call it, but it would be a device

9   approximately a foot by a foot, maybe a little larger, that's

10  used to automatically count currency in large amounts,

11  something that a bank would use or a retail store.

12  Q      So a professional money counter?

13  A      Yes.

14  Q      And as you sit here today, is Victor Vickers currently

15  charged in connection with the murder of Edward Ewing and the

16  assault of Kristen Forbush in Jackson County Circuit Court?

17  A      Yes, he is.

18         MR. HUGHES:  I don't believe I have any further

19  questions at this time, Your Honor.

20         THE COURT:  Thank you.

21         Mr. Langston.

22         MR. LANGSTON:  Thank you, Judge.  I just have a

23  couple.

24         THE COURT:  All right.

25  CROSS-EXAMINATION BY MR. LANGSTON:

| | |
|---|---|
| 1 | Q    Good afternoon, Detective Phillips. |
| 2 | A    Good afternoon. |
| 3 | Q    Detective Phillips, I've listened and read through the |
| 4 | transcript.  During your interview with Ms. Forbush, did she |
| 5 | ever say that the assailants were wearing gloves? |
| 6 | A    That may have been a follow-up question. |
| 7 | Q    But the evidence we have here now there was no mention |
| 8 | of gloves? |
| 9 | A    I don't believe so. |
| 10 | Q    All right.  And, of course, there was a full crime |
| 11 | scene investigation done for fingerprints, DNA, anything that |
| 12 | would help you solve this murder? |
| 13 | A    Yes. |
| 14 | Q    And isn't it true that Victor Vickers came in |
| 15 | voluntarily once he knew he was a person of interest and gave |
| 16 | you voluntarily his DNA? |
| 17 | A    That I cannot comment on.  I didn't -- I didn't have |
| 18 | contact with him.  I don't know how that went down. |
| 19 | Q    But you said you were intricately involved in the |
| 20 | investigation.  I understand you don't know everything about |
| 21 | it, but you have no reason to dispute that? |
| 22 | A    I have no reason to -- |
| 23 | Q    To doubt that? |
| 24 | A    Doubt that, no. |
| 25 | Q    All right.  And did you develop any fingerprints of |

1    Victor Vickers at the scene?

2    A        I don't recall there being any, no.

3    Q        And would that be no then?

4    A        Yes.

5    Q        All right.  What about DNA evidence?

6    A        Same.  No.

7    Q        And so no sloughing off of skin, no sweat, nothing?

8    A        Not that I am aware of.

9    Q        All right.

10            MR. LANGSTON:  That's all I have of this witness,

11   Judge.

12            THE COURT:  Thank you.

13            Mr. Hughes.

14            MR. HUGHES:  No further questions, Your Honor.

15            THE COURT:  All right.  Thank you, Detective

16   Phillips.  You may return to your seat.

17            (Witness excused.)

18            MR. HUGHES:  Government doesn't have any further

19   evidence.

20            THE COURT:  All right.  And do you have any evidence

21   you want to present?

22            MR. LANGSTON:  Judge, I do have -- before I do that,

23   perhaps to assist the Court to save some time, from what I

24   heard here, there is no shred of evidence that says that Edward

25   Ewing's murder had anything to do with drugs.  I'm wondering

how the government is trying to bootstrap an independent
nondrug-related State court murder charge into the relevant
conduct in a sale of now admittedly less than 50 kilograms of
marijuana.

THE COURT:  Well, the evidence presented here was
that the murder was connected with the suspicion that something
had been taken, was in the possession of Mr. Ewing and Ms.
Forbush, and I believe that it is a reasonable implication from
the evidence presented that this was drug-related activity.

Mr. Hughes, do you have anything further that you
want to comment on in that regard?

MR. HUGHES:  Well, Ms. Forbush clearly said she knew
Garron Briggs sold drugs, and so it's clearly drug-related and
that he didn't work.

THE COURT:  All right.  Your objection in that
regard's denied, Mr. Langston.

MR. LANGSTON:  Thank you, Judge.

Judge, before I call any witnesses, do you want to
wait until those witnesses are heard?  They're not really going
to be fact witnesses.  They will be more character witnesses.
Do you want to rule on -- because that may decide on who I
present and who I don't if you would make your ruling on the
relevant conduct under the 2A1.1.

THE COURT:  I believe the evidence presented is
appropriate relevant conduct and that it is appropriate to

consider that evidence; that the cross-reference is appropriate
as applied in the presentence report.  So I intend to take that
into consideration.

MR. LANGSTON:  Thank you, Judge.  Just so I'm clear,
that's after having reviewed the pleadings and I didn't make
much of an argument but you said you read all of that.

THE COURT:  I have read it.  I did read it and you
present some authority that you argue supports your position on
this, but I think that there -- I think that those cases that
you cite in the arguments that you make are not applicable in
this particular situation.  And one case that I had that was
affirmed on appeal, and I don't remember the name of the case,
but I'll look it up and provide it to you because I do remember
the situation, and I also would cite you to United States v.
French at 719 F.3d 1002, Eighth Circuit Court of Appeals in
2013.

So your objection -- I believe that given that
ruling, the objection to paragraphs 41 and 51 are disposed of
given my overruling your objection to paragraph 41.

Do you have anything further on any of those
matters, Mr. Langston?

MR. LANGSTON:  I do not, Your Honor.

THE COURT:  And, Mr. Hughes, do you concur that that
addresses those issues?

MR. HUGHES:  I do, Your Honor.  I agree.

1      THE COURT:  All right.  And that only leaves the

2   term of supervised release pursuant to paragraph 98 and the

3   maximum fine under paragraph 103 of the presentence report.

4      And, Ms. Gruenbacher, you've had a chance to look at

5   that some further, I believe?

6      THE PROBATION OFFICER:  Yes, Your Honor.  I advised

7   both counsel of the guideline -- the statutory range and

8   guideline range.

9      THE COURT:  And so the appropriate term of

10  supervised release is as stated under paragraph 98?

11     THE PROBATION OFFICER:  Your Honor, that is two to

12  three years of supervised release.  The statute is at least two

13  years.

14     THE COURT:  And up to three years, correct?

15     THE PROBATION OFFICER:  It's not less than two

16  years.

17     THE COURT:  Not less than two years.  And the

18  maximum fine?

19     THE PROBATION OFFICER:  It's $250,000, Your Honor.

20     THE COURT:  Thank you.

21     Do you have anything further you want to argue in

22  opposition to any of that, Mr. Langston?

23     MR. LANGSTON:  No, Judge.

24     THE COURT:  All right.  Mr. Hughes, do you concur

25  with Ms. Gruenbacher's analysis on those matters?

```
 1              MR. HUGHES:  Completely.

 2              THE COURT:  Thank you.

 3              All right.  So that being the case, given my

 4    rulings, Ms. Gruenbacher, have you had an opportunity to

 5    recalculate the total offense level?

 6              THE PROBATION OFFICER:  Your Honor, given the

 7    ruling, the offense level would remain the same but it is with

 8    the statutory maximum sentence of 60 months.  It would become

 9    60 months.

10              THE COURT:  Okay.  I'm going to take a brief recess.

11    I'll be back at five o'clock.

12              (A recess was taken.)

13              THE COURT:  Given my rulings on the objections to

14    the presentence report, the drug quantity that I found

15    attributable to Mr. Vickers is 5 to 7 kilograms of marijuana,

16    which would provide a base offense level of 12; however,

17    applying the cross-reference to Mr. Vickers' involvement in the

18    murder of Mr. Ewing and the assault to Ms. Forbush, the base

19    offense level given that application is as reflected in the

20    presentence report and it overrides the drug quantity amount.

21    The base offense level is 43, which is the same as the total

22    offense level as reflected in the presentence report.  Given

23    the drug quantity as we've discussed previously, there is a

24    statutory maximum sentence permissible of five years.

25              Mr. Langston, you said you had some character
```

1   evidence that you wanted to present, and I presume that you

2   would like to speak otherwise to what you feel would be an

3   appropriate sentence.

4           MR. LANGSTON:  I would, Judge.  My witnesses will be

5   short.

6           The first witness I will call is attorney, John

7   Humphrey.  He is the attorney that represents Mr. Vickers --

8   has represented Mr. Vickers and continues to in the State court

9   murder case.  I call him to speak to his involvement in the

10  case, his view of the case, and also whether it meets the

11  preponderance of the evidence standard that you need to decide

12  as to whether or not it should be a sentencing factor.  I know

13  you've decided --

14          THE COURT:  Well, I thought all you had left was

15  character witnesses, and I'd say that's a little more than a

16  character witness, but I'll listen to the testimony; and if it

17  causes me to reconsider, I'll do so.

18          MR. LANGSTON:  Thank you, Judge.

19          THE COURT:  Thank you.

20          Would you come up to the witness stand.

21          MR. HUMPHREY:  Permission to approach with my water.

22  I've been a little hoarse.

23                      DEFENDANT'S EVIDENCE

24  JOHN R. HUMPHREY, being sworn by the courtroom deputy,

25  testified:

DIRECT EXAMINATION BY MR. LANGSTON

Q Good afternoon, Mr. Humphrey.

A Good afternoon.

Q State your full name for the record.

A John R. Humphrey.

Q And are you an attorney?

A I am in Kansas City, Missouri.

Q All right.  And are you associated and familiar with Mr. Vickers?

A I am.

Q How is that?

A I was retained by Mr. Vickers when he was charged with the murder of Ed -- the last name --

Q Ewing?

A Ewing, Edward Ewing, yes.

Q Mr. Humphrey, you were in the courtroom and you viewed the videotape and was able to listen to Ms. Forbush's statement?

A I was.

Q So we know how Mr. Vickers was developed as a person of interest?

A I don't think the video accurately depicted his development as a person of interest.

Q Can you please tell the Court how you believe that came about?

A     The very first words of the case on the 911 tape were, "Help me, I've been shot."  The 911 call taker asked Ms. Forbush, "Do you know who shot you?"  Ms. Forbush said, "I don't F'ing know."  The call went on for a little while.  She never named anybody.  She only reiterated she didn't know who shot her and she was afraid she was going to die.

Within 15 or so minutes the police had responded.  I think it was the time frame.  By the time -- within 15 or 20 minutes the police responded to her house and the description of a white or silver car varying from a Grand Prix to a Cadillac was provided to the police by Ms. Forbush and neighbors.

Based on that information police, I believe, asked her, Ms. Forbush, if she knew anybody that would belong to such a car.  And I believe her response was, "Garron Briggs," and then they asked about his running buddies, and I believe that's how Mr. Vickers and Mr. Briggs were developed as suspects.

The whole drug thing, rob my house, garage door opener, I'm familiar with that story, but my concern on the case is this:  I don't think they did it.  If Ms. Forbush was not involved in setting up the murder of Ed, she wouldn't be alive.  There was no way three guys go into a house reportedly looking for drugs, kill a man hard with nine bullets at least and leave a witness grazed.  It just doesn't add up.

Q     In your investigation in preparing the defense of Mr.

1  Vickers' murder case in Jackson County, have you developed any

2  information that gives credence to your belief or theory that

3  Ms. Forbush may have been on the inside of what happened?

4  A      There was some text messages.  There's voluminous

5  amounts of text messages that would indicate she and Ed had had

6  problems, but in the couple of days immediately preceding his

7  death there were public Facebook postings from Ms. Forbush

8  about her sweetie, her honey, Ed, as if she was sucking up in

9  anticipation of his demise.

10  Q      Did your investigation develop any other romantic

11  interest that Ms. Forbush might have had at that time?

12  A      I was just reviewing some text messages, and in the

13  information that I have, the discovery provided to me by the

14  police back then before the case was dismissed, the call logs

15  that I have don't have the names associated in the spreadsheet

16  with somebody who appears to have some interest in her.

17          My further -- if I may.  You got me on a role here.

18  At the time the case was pending the prosecutor, Dawn Parsons,

19  and the State suggested to me she was going to file a motion to

20  collect DNA evidence.  I went and saw may client in the jail.

21  He said, "I'll give it to her."  In my estimation, in my

22  experience there is no guilty man who has been at a crime scene

23  who will voluntarily and willingly provide his DNA.

24  Q      So based on the totality of your investigation and the

25  information that you've seen today, what do you believe is the

likelihood of conviction in the murder case?

A    Not at all.  In fact, when the case was last -- the case had been continued a number of times, a couple of times by the defense, but most recently by the State; and when it was last set, the prosecutor filed a dismissal, and I think she was aware that there were federal charges pending and hoping that she could avoid having to deal with the State homicide that was fairly weak hoping that something else would become of Mr. Vickers in the federal system.

Q    Mr. Humphrey, how long have you been an attorney?

A    Since October 27th, 1987, 28 years.

Q    Twenty-eight years?

A    Yes, sir.

Q    Have you tried other murder cases?

A    I have.

Q    About how many?

A    At least ten murder cases.

        MR. LANGSTON:  Judge, that's all the questions I have of Mr. Humphrey.

        THE COURT:  Thank you.

        Mr. Hughes.

CROSS-EXAMINATION BY MR. HUGHES:

Q    Mr. Humphrey, see if I got this right.  Your investigation and theory of this murder case is that Kristen Forbush was a part of the plan to execute her fiance, Edward

```
 1   Ewing?
 2   A        Absolutely.  It is not -- yes.
 3   Q        And as part of your theory, you believe that she
 4   allowed herself to be shot one time through the head and neck
 5   area to make it look good?  Is that your theory?
 6   A        Absolutely.
 7   Q        And that's the theory you're going to advance when Mr.
 8   Vickers goes to trial in Jackson County?
 9   A        When Mr. Vickers goes to trial in Jackson County, if he
10   retains me for the refiled case, I can proceed under that or
11   any other plausible defenses, but the fact is there are plenty
12   of them out there which means he didn't do it.
13   Q        And, of course, you are paid to represent him, correct?
14   A        I'm not.  I am not under retainer.  I told Mr. Vickers
15   and his family and I discussed that when his State case was
16   dismissed, that if it should be refiled, that we would have to
17   renegotiate my retention.  So I am not being paid to represent
18   Mr. Vickers.
19   Q        Have you been paid at all?
20   A        I did when the case was filed.
21   Q        And what were you paid?
22   A        I honestly don't remember.
23   Q        But you were paid some amount of money to represent
24   him?
25   A        Absolutely.  Yes.
```

1    Q      And that's your responsibility to represent his

2    interest, correct?

3    A      Absolutely.

4    Q      And it wouldn't be consistent with your job to tell him

5    theories that didn't comport with your theory of defense?

6    A      Mr. Vickers is pretty aware of all of the theories that

7    possibly condemn him, and the State is pretty much proceeding

8    on what they believe to be the most obvious one.

9    Q      And you saw the video; is that correct?

10   A      I saw the video that Ms. Forbush provided the police

11   department about a week after the shooting, after she had been

12   interviewed a number of times in the hospital suggestively, in

13   my opinion, shown photographic lineups of possible witnesses.

14   She never even named a third person.  Her testimony initially

15   was that the lighting was bad, the hall lights were on.  The

16   porch light wasn't on.  She could not see their faces.  She

17   then concedes that they had hoodies on.  She could see maybe up

18   to their eyebrows.  She never describes whether or not the

19   eyebrows up or down.

20   Q      But you saw the video and she said, and I quote, I am a

21   hundred percent sure that Garron Briggs shot me in the neck?

22   A      I saw that video, yes.

23   Q      And you saw the video when she said she's a hundred

24   percent sure that Victor Vickers had a gun and went inside the

25   room where her fiance was?

```
 1   A       I saw the video, yes.

 2   Q       And your theory is that she was in on the whole caper?

 3   A       My theory is that she absolutely could have been in on

 4   it.  Absolutely.  And there is nothing to disprove that.

 5           MR. HUGHES:  Judge, I have no further questions.

 6           THE COURT:  All right.  Mr. Langston.

 7           MR. LANGSTON:  I have no redirect, Judge.

 8           THE COURT:  Thank you, Mr. Humphrey.

 9           (Witness excused.)

10           MR. LANGSTON:  I have one character witness.  I

11   would like to call Ms. Lavern Vickers.

12           THE COURT:  Ma'am, would you come up to the witness

13   stand for us, please.

14   LAVERN VICKERS, being sworn by the courtroom deputy, testified:

15   DIRECT EXAMINATION BY MR. LANGSTON:

16   Q       Good afternoon, Ms. Vickers.

17   A       Good afternoon.

18   Q       Would you please state your full name for the record.

19   A       Yes.  Lavern Vickers.

20   Q       And would you move the microphone a little closer to

21   your mouth so we can all hear you clearly.

22           Thank you.

23           And you are the mother of Victor Vickers; is that

24   correct?

25   A       Yes, I am.
```

```
 1    Q      Does Victor have brothers and sisters?

 2    A      Yes, he does.

 3    Q      How many brothers?

 4    A      Biological he has two sisters, but other family,

 5    there's nine of them.

 6    Q      And where does he fit in the structure of the siblings?

 7    A      He's kind of next to the last.

 8    Q      So next to the youngest?

 9    A      Yes.

10    Q      All right.  And where did he attend high school?

11    A      He went to Northeast for maybe a semester or two, then

12    he actually graduated from Hickman Mills.

13    Q      All right.  And after graduating from high school -- or

14    before I ask you that, what kind of student was he in high

15    school?

16    A      Above average.

17    Q      All right.  And did he participate in school

18    activities?

19    A      Yes, he did.

20    Q      Was he ever expelled from school?

21    A      Yes, he was.

22    Q      All right.  What was that for?

23    A      Oh, I'd say -- let me think.  That's been so many years

24    ago.  I think it was acting out.

25    Q      So it wasn't criminal behavior?
```

```
 1   A      No.

 2   Q      Did he pursue his education after high school?

 3   A      He did.  He attended Longview Community College for a

 4   couple of years.

 5   Q      And what course of study was he pursuing at Longview?

 6   A      I believe it was business management or business

 7   administration, something in that field.

 8   Q      Tell me about Mr. Vickers' work history.  What age did

 9   he first start working?

10   A      I'd say probably around 13, 14.

11   Q      Can you tell me what type of jobs he had at that point

12   in time?

13   A      I think he first started off at the Police Athletic

14   League and I know he worked at Taco Bell, Burger King,

15   QuikTrip.

16   Q      Let me ask you about the QuikTrip job.  Was he in a

17   leadership position?

18   A      He was manager.

19   Q      He was manager at QuikTrip?

20   A      He worked up to manager.

21   Q      Did he also work for Time Warner Cable?

22   A      He did.

23   Q      Do you know what his job functions were there?

24   A      I think something with maintenance, not positive.

25   Q      That was before the QuikTrip job?
```

```
 1   A       Right.

 2   Q       Then after QuikTrip, did he continue in his career?

 3   A       He did.

 4   Q       And do you know where he worked after that?

 5   A       He went to Caremark.  I think it's a prescription

 6   solutions in Lee's Summit.

 7   Q       And do you know what his job was there?

 8   A       I think it's like a call center.  I believe it's

 9   customer service.

10   Q       To your knowledge, was he a good employee?

11   A       Yes.

12   Q       On time, came to work?

13   A       Yes.

14   Q       All right.  In, I believe it was 2005, did Victor --

15   Mr. Vickers, excuse me, inherit some money from his stepfather?

16   A       That's correct.

17   Q       Can you tell us how much he inherited?

18   A       It was right around $20,000.

19   Q       Can you tell us what Victor did -- excuse me, what Mr.

20   Vickers did with that money?

21   A       He actually incorporated his own record label and kind

22   of started his entertainment company.

23   Q       Can you tell us a little bit about what the

24   entertainment company did and what it was?

25   A       They would like contract different entertainers, you
```

```
 1   know, to come here and perform and just give events.

 2   Q      Are you familiar -- we've heard some discussion on

 3   video about an event at the CoCo Key Water Resort.  Are you

 4   familiar with that event?

 5   A      Yes, I am.

 6   Q      And are you familiar with the degree of success that it

 7   had?

 8   A      It was very successful.

 9   Q      Do you know from firsthand knowledge about how many

10   people attended?

11   A      Yes, because I worked the door.

12   Q      Okay.

13   A      Approximately, I'd say, a thousand people.

14   Q      All right.  And was there any trouble that night?

15   A      None.

16   Q      No fighting between partygoers?

17   A      There was one little incident between two ladies but

18   that got squashed so fast.

19   Q      And so that was a concert that Mr. Vickers' production

20   company had produced?

21   A      Yes.  It was a beach -- or night at the beach they

22   called it, I believe.

23   Q      Does Mr. Vickers have other business interests?

24   A      He did.  He did have.  He actually had started a

25   janitorial service.  He had the recording studio that he was
```

```
 1   contracting out and was able to issue out -- I'm sorry,
 2   recording time.
 3   Q     So his production company, his entertainment company,
 4   and his record label was successful enough for him to then rent
 5   a recording studio?
 6   A     Correct.
 7   Q     And then make money from the recording studio as well
 8   as expanding his entertainment business?
 9   A     Yes.
10   Q     In 2011, if you recall, is that when he incorporated
11   Sparkle Master, which was the janitorial service?
12   A     That's correct.
13   Q     And so he was running both companies?
14   A     Right.  Right.
15   Q     Since he's been incarcerated, has he started a third
16   company?
17   A     Yes, he has.  Jail Send.
18   Q     Can you tell me what Jail Send is and does?
19   A     It just makes it a little bit easier -- I mean, if
20   anybody knows when you're trying to correspond with your loved
21   one, you know, while they're incarcerated, it's time-consuming,
22   and basically we just make it -- it's like a one-stop shop.
23   You go to the website or you can text or email your pictures to
24   us.  We complete the process.  You no longer have to run to the
25   post office to get stamps, envelopes.  You don't have to go to
```

1    CVS or Walgreens to get your photos printed.  You just send
2    everything to us.
3    Q      And was that Mr. Vickers' idea while he was
4    incarcerated that he came up with the idea of this business?
5    A      Yes.  He sure did.
6    Q      And was he also instrumental in writing the business
7    plan and the operational plan and getting the company up and
8    running?
9    A      He wrote everything.
10   Q      And that would include the appropriation papers?
11   A      I actually did that.
12   Q      All right.  And is Jail Send having success?
13   A      It is.  It is.
14   Q      Do you have people that if Mr. Vickers were available
15   to devote his time and talent to that would be willing to
16   invest in that business?
17   A      Yes.  They are just waiting on the owner.
18   Q      Can you speak very briefly to how Victor's 31-month
19   incarceration has affected you and your family?
20   A      It's been hard.
21   Q      Let me ask another question while you gather yourself.
22   Obviously as his mother, you miss him tremendously and other
23   members of his family miss him?
24   A      They do.
25   Q      His spirit and camaraderie?

```
 1   A      Most definitely.

 2   Q      You say he has nine siblings?

 3   A      That's correct.

 4   Q      Does he have many cousins?

 5   A      Oh, my goodness, yes.

 6   Q      Are many of the people that we're talking about here in

 7   the gallery here today?

 8   A      Yeah.  Some couldn't stay the whole time.

 9          MR. LANGSTON:  Judge, I don't think I have anything

10   further from Ms. Vickers.

11          THE COURT:  Thank you.

12          Any questions, Mr. Hughes?

13          MR. HUGHES:  Yeah.  Real briefly.

14   CROSS-EXAMINATION BY MR. HUGHES:

15   Q      Ms. Vickers, good afternoon.

16   A      Good afternoon.

17   Q      Has your son ever been to prison?

18   A      To prison?

19   Q      Before this case, has he ever been in prison?

20   A      To prison, no.  Prison, no.

21   Q      So your recollection is he's never done any time in

22   Missouri?

23   A      Yes, he's done time.

24   Q      Missouri Department of Corrections?

25   A      Yes.
```

1   Q      What did he do to get time in the Missouri Department

2   of Corrections for?

3   A      I believe it was tampering.

4   Q      And, in fact, we writted him out of State custody to

5   get him over here where we originally charged him; is that not

6   correct?

7   A      That's correct.

8               MR. HUGHES:  I don't have anything further.  Thank

9   you.

10              THE COURT:  Thank you.

11              Mr. Langston.

12              MR. LANGSTON:  I have nothing further, Ms. Vickers.

13              I have no more witnesses to present.  I would have a

14  brief comment about sentencing whenever the time is

15  appropriate.

16              THE COURT:  All right.  Thank you.

17              Well, before I give you the opportunity to speak to

18  sentence, I told you that I would consider Mr. Humphrey's

19  testimony in determining whether or not I was going to

20  reconsider the murder cross-reference.  I do not find that Mr.

21  Humphrey's testimony has changed my opinion about that.  I

22  believe that the videotaped statement of Ms. Forbush was very

23  compelling; that Ms. Forbush in that presentation appeared to

24  me to be very credible and unequivocal in terms of her

25  testimony, and I find that Mr. Humphrey's contrary opinions

1  about that are speculative at best and are not of the nature

2  that caused me to reconsider that.

3         So given my position on all of that, as reflected in

4  the presentence report, the total offense level is 43.  Mr.

5  Vickers' criminal history category is III.  The guidelines,

6  given those circumstances, would call for life imprisonment.

7  However, given the offense of conviction and the drug quantity,

8  there's a statutory maximum, as I think everyone agrees, of

9  five years, and that would supersede the recommended guideline

10 range, so we're talking a maximum of five years.

11        So, Mr. Langston, would you like to speak now to

12 what you feel would be an appropriate sentence given my rulings

13 in this matter?

14        MR. LANGSTON:  Judge, I think your rulings in this

15 matter somewhat muted the other arguments that I would make.

16 It would be futile.  I would ask to address the supervised

17 release condition as part of the sentencing order, and that I

18 have a request about placement.  I know you don't control that.

19 The Bureau of Prisons does.

20        THE COURT:  All right.

21        MR. LANGSTON:  I would ask that the condition that

22 he not allow -- that he not be allowed to be self-employed be

23 lifted.  We have every hope that Jail Send will continue to

24 make its way along, and that is something that Mr. Vickers will

25 be able to go back to once he is released and is serving his

1  supervised release time.  I believe that his entertainment
 2  company will still be viable.  Whether or not he decides to
 3  pursue the janitorial company would be up to him, but I think
 4  it's overbroad and unduly punitive for him not to be able to be
 5  self-employed.
 6          THE COURT:  I'm going to deny your request, but I
 7  will tell you that I will reconsider that upon Mr. Vickers'
 8  release from custody depending upon what the situation is at
 9  that time and what possible supervision or conditions might be
10  appropriate; and if Mr. Vickers' company is a going, legitimate
11  concern, I would want to attempt to provide him the opportunity
12  to continue with that.
13          MR. LANGSTON:  Thank you, Judge.
14          THE COURT:  Mr. Hughes, do you want to speak to
15  sentence?
16          MR. HUGHES:  Yes, Judge, very briefly.
17          First I want to thank the Court for your time and
18  your patience.  This has been an information filled afternoon.
19          I want to point out one thing.  You know, my sworn
20  oath is to do justice, and I stand before this court and tell
21  you that my representation about the lesser-included and the
22  five-year cap is totally based on me being analytical and
23  relying on the appellate point of our office; however, that
24  cuts against every fiber of my body because Mr. Vickers is
25  without question the most narcissistic individual that I've

ever prosecuted in 25 years.

He's a sociopath, not an ounce of remorse. He ruthlessly, ruthlessly slaughtered an innocent man over $40,000. He and his cousin were making a lot of money in the drug game. He was selling marijuana. His cousin selling coke. What kind of self-respecting drug dealer leaves $40,000 around anyway? It's just shocking.

So I say all this to say, he's manipulative. We've seen that. Don't need to rehash that. His efforts to manipulate Darryl Taylor's testimony. I mean, he will do anything to save his own hide. He is completely incapable of accepting even a scintilla of responsibility for anything he's done, and based upon the totality of this evidence proves Mr. Victor Vickers is a very dangerous and remorseless man.

For these reasons, I would respectfully request the Court impose the maximum sentence on these facts, which is 60 months.

Thank you.

THE COURT: All right. Thank you.

Mr. Vickers, is there anything you would like to say?

THE DEFENDANT: Good afternoon, Your Honor.

First of all, I would like to say, you know, I would like to apologize to you, to the Court for, one, for having to be here today. I do realize that my actions not only affect my

1  life but they affect the lives of everyone around me.

2         Mr. Hughes just sits here, you know, and he painted

3  me to be this bad person and it's just really unfortunate.  Mr.

4  Hughes, he doesn't know me from anything besides these pieces

5  of paper, and it's just so unfortunate.

6         Your Honor, I can understand -- you know, I see this

7  man's family here.  It hurts me because I went through the same

8  thing with my brother.  My brother was killed, murdered in

9  2013.  What did the Kansas City police do about it?  They

10 didn't do anything, Your Honor.

11        But God knows my heart.  God knows the truth about

12 this case.  God knows that I'm not guilty of this crime, Your

13 Honor, and I'm just respectfully asking, I'm humbling asking

14 for a chance to let the truth come out in State court.

15        Mr. Humphrey got up here and, you know, he just

16 tried to give you a theory.  There's so much you haven't heard,

17 Your Honor.  There's so much in that discovery, there's so much

18 in that girl's statements that I really wish could come out at

19 trial.  But unfortunately, Your Honor, we're here for drug

20 charges and I'm completely remorseful.

21        I have changed my life in so many ways because --

22 I'm sorry.  Forgive me.  I'm not the greatest public speaker

23 but I say this.  I'll start here.  My mother, she raised us in

24 church and, yes, I did stray from that path along my later

25 years in life before I got incarcerated this time, but in

Jackson County Sister Barbara, she used to come up and see us every Sunday and every Sunday I would go to church. I would go hear Sister Barbara. She would sing verses. It was just so inspiring and that's when I truly began my spiritual path.

And, like I say, it's unfortunate that even you, Your Honor, that all you know me by is what's on these pieces of paper. God knows the truth about what happened that day. God knows where I was at that day, and I would like just a chance for all of that to come out at trial.

I know that without an enhanced sentence as a result of the murder allegations -- again, God knows that I'm not guilty of -- I know the enhanced sentence -- you did the quantity 5 to 7 kilograms. That's level 12. That's 15 to 21 months. I know it would be time served without that.

I'm just respectfully asking that you just give me a fair chance, Your Honor. I know you're a fair judge. I followed your cases over the last year as close as I could. Everybody at CCA told me that I come across, I inquire and, you know, I heard a lot of people -- somebody told me that you specifically said that you believe in second chances. I've heard you specifically have told someone that. A lot of people tell me that you gave them the low end of the guidelines or even under their guidelines.

Now, I do know that -- well, I heard, I'll say, that you gave someone 100 years a few months ago. I know Andre

```
1    Taylor got life plus 30, but Andre's sentence was mandatory and
2    Andre and I are two completely different people, but either way
3    I know that you are a fair judge.
4            I know that -- I also know you've been a judge for
5    36 years which is longer than I've been alive, which is
6    extremely impressive so I take my hat off to you for that.
7            Again, I'm just humbly asking for a second chance to
8    get my life back on track, to start over, to get a second
9    chance at life.
10           I apologize to you, to the courts.  I apologize to
11   my family, and I pray that you all have peace over there.  I
12   wish you would pray for us and for our family.  We're going
13   through the same thing.  I know that you all need closure, and
14   I truly hate, I hate that I have to stand here in front of you
15   like this.  I hate it.  Our family's going through the same
16   thing.  We don't know who killed our brother.  KCPD, they
17   completely stopped my brother's investigation, and I know you
18   all are looking for the same closure that our family's looking
19   for, and I apologize for that.
20           Your Honor, I do want to stop there.  I feel like
21   that I've already gone too far.  I didn't want to say any of
22   this.  I apologize.  I felt like it needed to be said.  But,
23   again, I apologize to you all.  I apologize to the courts.  I
24   apologize to my family.  And I just -- I ask for a second
25   chance, Your Honor.  Please give me a second chance.
```

1          Thank you.

2          THE COURT:  All right.  Thank you, Mr. Vickers.

3          Mr. Langston, did you have something further you

4    wanted to say?

5          MR. LANGSTON:  Nothing further, Judge.

6          THE COURT:  All right.  Thank you.

7          Well, Mr. Vickers, as you heard, I found that you

8    were implicit in the murder of Mr. Ewing and the shooting of

9    Ms. Forbush.  I don't think there's any doubt that she clearly

10   identified you and she knew you and that you were there, and

11   you're very fortunate in this circumstance that the maximum

12   that I can give you is five years because you clearly deserve

13   more than that, but that is not within my power.

14         If the charge goes forward in Jackson County, you'll

15   have an opportunity to address that, but I believe that the

16   government has met its burden in this case in establishing your

17   responsibility and that it is a matter that needs to be taken

18   into consideration in your sentencing here.

19         I believe that taking into consideration all of the

20   factors set forth under 18 U.S.C., Section 3553, including the

21   nature and the circumstances of the offense, and the offense

22   here was the drug offense and the related conduct, which I've

23   already spoken to and don't need to say much more about, the

24   need for the sentence to reflect the seriousness of your

25   offense, promote respect for the law, provide just punishment,

1  afford adequate deterrence to criminal conduct, and protect the

2  public from future crimes, which, I believe, is a real

3  consideration. Hopefully there's some correctional treatment

4  that can be of benefit to you. But I believe that taking into

5  consideration all of the factors set forth under 18 U.S.C.,

6  Section 3553, that a sentence of five years in the custody of

7  the Bureau of Prisons is a reasonable and appropriate sentence,

8  and I'm going to sentence you to that term on Count 1 herein.

9        Upon your release from custody, I'm going to order

10  you be placed on supervised release for a period of five years.

11        I find that you do not have the ability to pay a

12  fine. I waive the imposition of any fine, but you are ordered

13  to pay the special assessment in the amount of $100, which is

14  due immediately.

15        While on supervised release, I'm going to order that

16  you comply with all the mandatory and standard conditions that

17  have been adopted by this court for supervision as well as the

18  special conditions listed in Part D of the presentence

19  investigation report.

20        And, Mr. Langston, I know that you've been very

21  thorough. I'm confident that you've reviewed those conditions

22  with Mr. Vickers; is that correct?

23        MR. LANGSTON: That is correct, Your Honor. We have

24  reviewed the conditions of supervised release.

25        THE COURT: All right. Thank you.

1    I'm going to order that you be retained in custody

2 for service of the sentence imposed.

3    And, Mr. Vickers, you do have a right to appeal the

4 sentence that's been imposed against you.  You have only 14

5 days from today, the day the sentence was imposed, to file a

6 notice of intent to appeal to preserve your right to appeal.

7 If you believe there is a basis for appeal, you would have to

8 file that notice of intent to appeal within 14 days of today or

9 your right to appeal will be waived.

10    And my clerk, who is seated here just to my left,

11 has a form that she will give you that you can use to file that

12 notice of intent to appeal if it's something that you wish to

13 pursue.

14    Mr. Hughes, anything further that needs to be

15 addressed?

16    MR. HUGHES:  Only to point out to your clerk that

17 Mr. Vickers was only charged in the second superseding

18 indictment; therefore, there's no need to dismiss the first

19 indictment or the first superseding indictment.

20    THE COURTROOM DEPUTY:  Thank you.

21    THE COURT:  All right.  Thank you.

22    And, Mr. Langston, anything further from you, sir?

23    MR. LANGSTON:  Nothing.

24    Waiver of Mr. Vickers, Judge.

25    THE COURTROOM DEPUTY:  Was there a recommendation?

1          MR. LANGSTON:  Thank you.

2          I ask that you make a recommendation that Mr.

3    Vickers be sent to a location that is obviously appropriate

4    under the Bureau of Prisons' guidelines but as close to Kansas

5    City as possible.  There may be this murder case that needs to

6    be dealt with and worked on.  His family, as you can see, is

7    very supportive and they're all here in the metro area.  So if

8    you could make that recommendation in your findings.  I

9    understand the Bureau of Prisons will make the decision.

10         THE COURT:  All right.  I will do that.

11         MR. LANGSTON:  Thank you, Judge.

12         THE COURT:  Thank you.  That's all.

13         (Adjournment)

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF OFFICIAL REPORTER

I, Katherine A. Calvert, Federal Official Court Reporter, in and for the United States District Court for the Western District of Missouri, do hereby certify that the foregoing is a true and correct transcript of the stenographically reported proceedings in UNITED STATES OF AMERICA, Plaintiff, vs. VICTOR VICKERS, Defendant, No. 12-00291-CR-W-GAF.

Dated this 28th day of July, 2015.

_____
KATHERINE A. CALVERT, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER